(815 P.2d 569)

No. 65,340

STATE OF KANSAS, *Appellee*, v. MICHAL A. WILLIAMS, *Appellant*.

Opinion filed July 3, 1991.

*Thomas Jacquinot*, assistant appellate def:nder, *Eugene Montis*, legal intern, and *Jessica R. Kunen*, chief appellate defender, for the appellant.

*Alisa M. Arst*, assistant district attorney, *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before LARSON, P.J., LEWIS and PIERRON, JJ.

LEWIS, J.: This is an appeal by the defendant from his conviction on one count of rape. As a result of that conviction, the defendant was sentenced to a term of not less than 10 nor more than 25 years in the custody of the secretary of corrections.

A.S. is the complaining witness and victim of the alleged rape in the instant matter. She testified that she had known the defendant for a couple of months and that he had, during that period of time, driven her to and from work and other places. In addition, she testified that, during the period of their ac-

quaintanceship, she saw the defendant two or three times a week and sometimes more frequently.

On the night the crime was alleged to have taken place, A.S. met the defendant at her cousin's home. In due time, the cousin's boyfriend showed up, and the four drove around Wichita, performing various and sundry errands. After the errands were completed, all four went to the defendant's apartment, where they ate, and drank some beer.

The group then left the defendant's apartment and drove to A.S.'s apartment, where the cousin and her boyfriend remained. It developed that A.S. needed to buy some shoes for work, so A.S. and the defendant left her apartment in defendant's car to purchase the shoes. A.S. was unable to obtain any money out of her bank auto teller, so A.S. and the defendant went to the defendant's apartment to wait until approximately 6 p.m., when it was believed A.S.'s money would become available through the bank auto teller.

While A.S. and the defendant were waiting in the defendant's apartment, A.S. testified that defendant started to question and pressure her about having sex. A.S. testified that she made every possible effort to discourage the defendant but to no avail. Ultimately, A.S. testified she was forced by threat of severe bodily harm to disrobe and engage in forced, nonconsensual intercourse with the defendant. Afterwards, defendant permitted A.S. to get dressed and drove her back to her apartment. There were a number of individuals who saw A.S. after she returned to her apartment, all of whom noticed that her face was bruised and swollen. These witnesses also noted that A.S. was very upset, and she indicated to several witnesses that she had been raped. Ultimately, A.S. was taken to the hospital where the usual procedures were employed to treat A.S. and to collect evidence of the sexual assault.

The defendant offered an alibi defense. His common-law wife testified that, during the time the alleged rape was taking place, the defendant was with her. She stated that defendant picked her up from work at about 6:30 p.m. and was with her the rest of the evening. This testimony was consistent with the explanation given to police officers by the defendant on the night in question.

The testimony, however, was totally at odds with the description of events given by A.S.

As the trial court pointed out, the ultimate question for the jury was whether it believed the testimony offered by the State or the testimony offered by the common-law wife of the defendant. The trial court described the defendant's wife as a credible witness but indicated that, apparently, the jury chose to believe the version offered by A.S. and the other witnesses for the State.

The principal issue on this appeal involves the defendant's refusal to obey a court order to give a semen sample and the use of evidence of that refusal by the State.

As will be related, the defendant was invited both voluntarily and by a court order to provide a semen sample. The defendant refused to do so. Prior to trial, the defendant filed a motion in limine, requesting the court to order the prosecutor not to comment on defendant's refusal to give the semen sample. The court refused to issue such an order, and substantial testimony concerning this refusal by the defendant was admitted. In addition to the testimony offered by the State showing the refusal of the defendant, the prosecutor, on final argument, mentioned this refusal to the jury on three separate occasions.

The questions presented are whether it was proper, under the facts shown, to order the defendant to give a semen sample and whether it was proper to permit the State to introduce evidence of defendant's refusal to give the sample and argue that refusal to the jury on closing argument. In other words, our focus is on whether the trial court erred in refusing to grant the defendant's motion in limine.

The issue of whether the defendant would give a sample of his semen came up on two different occasions. The first time, defendant was asked to do so voluntarily. The police officer testified that, during a conversation with defendant, he advised the defendant that, if he was telling the truth, his semen would not match that taken from the victim. This testimony followed:

"Q. What was his answer?
"A. He would—it would not match.
"Q. So then what did you ask him?
"A. I asked him if he would be willing to give us a semen sample."

[At this point defendant's counsel objected to the witness answering the question; the objection was overruled.]

"Q. Why—what did you ask him then?

"A. His response was 'Today?' And my response was 'Right now,' and he replied 'No.' Well—and I said, 'Why?' His response was 'I don't know. I'm not into nothing like that. I don't know.' "

The issue came up again after a court order was obtained, ordering defendant to give samples of blood, saliva, pubic hair, and semen. This order was issued rather perfunctorily, and the record shows no evidentiary foundation was laid by the State to obtain this order. In addition, the record indicates that there was no objection by defendant's counsel.

"THE COURT: Michal Williams. There's a motion for blood, saliva, seminal fluid and pubic hair.

"MR. SYLVESTER [Defendant's attorney]: No objection, Your Honor."

After the order was issued, a police officer was dispatched to obtain the samples. The samples of blood, saliva, and pubic hair were obtained, but no semen sample. The following testimony indicates what took place:

"Q. . . . You did—at some later time the defendant initially told you that he would not submit a semen sample in your first conversation, is that correct?

"A. A voluntary semen sample.

"Q. And later a court order was obtained to obtain that for us, is that correct?

"A. That's correct. "Q. And with that, did you obtain blood, saliva and a semen sample?

"A. Yes, I did.

"Q. And were you able to do so?

"A. We obtained the blood, saliva, pubic hair. The semen sample was not obtained.

"Q. Why not?

. . . .

"A. Mr. Williams refused to provide that sample to us.

. . . .

"Q. Am I correct in my reading of your notes from that interview with Mr. Williams that he advised he would not give you that semen sample?

"A. That was my indications in the note, yes.

"Q. And he indicated that he would not do so because he was incapable of doing so at that time, is that correct?

"A. His exact wording as I recall it was 'Man, I don't jack off.'

. . . .

"Q. Okay. What sample were you seeking that you did not obtain?

. . . .

"A. Yes. The court order also requested a semen sample from the individual, Michal Williams.

"Q. Okay. And did you obtain one at that time?

"A. No, ma'am.

"Q. Why not?

"A. He refused.

"Q. Did you at some later time get that sample, semen sample?

"A. We never did obtain a semen sample from Michal Williams. There were two requests made on January the 3rd, one after his initial statement that he would not provide it and again immediately after the statement. There were no other requests."

This testimony was permitted as a result of the trial court's denial of the defendant's motion in limine. The defendant made every possible pretrial effort to deter testimony concerning his refusal. During the trial, objections were made to the testimony outlined above and overruled. Finally, defendant requested that a continuing objection be noted to such testimony, and this request was granted by the trial court.

As a result of the denial of the motion in limine and the refusal of the trial court to sustain defendant's objections, the jury heard substantial testimony to the effect that defendant had refused to give a semen sample. In addition to the testimony, the prosecutor, on final argument, commented on defendant's refusal no fewer than three times, telling the jury:

"Once the standards, the known standards, were found and given by Michal—Michal Williams, except for the semen he wouldn't provide, they were able to make comparisons, blood comparisons, and those comparisons showing up as secretors in the vaginal swabs.

. . . .

"Beyond all that, there's only one other thing that supports what [A.S.] says, and that's what the defendant says, and he supports it right down the line, friendship, gives her a ride to work, everywhere they went that day. He supports it all the way until the going gets tough or it gets just a little too hot where he's going to be found out and then he sort of gives himself away in saying that he won't contribute semen.

. . . .

"Besides when Michal Williams talked to Detective Moser, why didn't he say, 'Come on over to my house and take a look around?' Well, no, just like with the semen, and, yes, he is a lay person, expecting that semen to prove something and maybe holding back on that because he knew his own guilt."

The record clearly discloses that the State wanted the jury to believe that the semen sample would have provided the final proof of guilt. The implication made by the prosecution in its closing arguments is that the defendant refused to provide the semen sample because he was guilty and that the sample would have proven guilt beyond any reasonable doubt. In summary, the State wanted the jury to believe defendant had deprived it of relevant, probative evidence in refusing to give a semen sample.

A search of the record reveals that at no time did the State actually prove that the defendant's refusal to provide a semen sample deprived it of any relevant evidence. There is no factual support for the proposition that the missing sample would have given the State or the jury any more evidence of defendant's guilt than it already had. In addition, as pointed out above, the State did not present any evidence in obtaining the court order to show the need for or relevance of the semen sample.

The serologist called by the State testified that she was able to perform the necessary serological tests by using the samples of blood, saliva, and pubic hair donated by the defendant. One of the most important determinations of defendant's guilt or innocence was a test to reveal whether defendant was a "secretor" or a "nonsecretor." The testimony of the serologist indicated that, in order to perform this test, all that was required was that known samples of defendant's bodily fluids, *either saliva or semen*, be provided. The witness testified that she was able to make the determination in this case from the saliva sample furnished by the defendant. The following testimony is illustrative:

"Q. You did the Lewis typing, and as I understood your testimony, the main basis for the Lewis typing is to predict whether or not someone will be a secretor, is that correct?

"A. Or a nonsecretor, that's correct.

"Q. And you're able to determine that in Mr. Williams' case from his saliva sample?

"A. Because of his Lewis type, I could not predict the secretor status.

"Q. But you were able to determine from his saliva sample that he was a secretor?

"A. Yes, I was.

"Q. And you did the group 1 analysis and PGM subtype?

"A. That's correct.

"Q. Is that the normal kind of testing you would do in a rape case?
"A. When suspect standards are submitted, it is.
"Q. *Would you normally do more testing on that?*
"A. *No, I would not.*"

The testimony of the serologist demonstrates that, had defendant given a sample of semen, it would have proven nothing more than the blood, saliva, and pubic hair samples, which he had already provided. The State's own expert witness verifies that she would not have done any more testing than she did in this or any other rape case. Clearly, the refusal of the defendant to provide semen did not deprive the State of any relevant evidence.

Having set the factual basis for this appeal, we proceed to examine the legal questions raised.

## DID THE COURT'S ORDER VIOLATE DEFENDANT'S
## FOURTH AMENDMENT RIGHTS?

The defendant argues that the order of the trial court to provide a semen sample violated the defendant's rights under the Fourth Amendment to the United States Constitution and Section 15 of the Bill of Rights of the Kansas Constitution to be secure from unreasonable searches and seizures. During the course of our analysis, we shall refer to those rights as the defendant's Fourth Amendment rights.

One immediate problem is the defendant's failure to raise these constitutional grounds at the trial level. Generally, constitutional grounds for a reversal of a conviction may not be asserted for the first time on appeal. *State v. Goss,* 245 Kan. 189, 193, 777 P.2d 781 (1989); *State v. Budden,* 226 Kan. 150, 154, 595 P.2d 1138 (1979).

We have recognized exceptions to the rules stated above. We have said that "if a newly asserted issue involves only a legal question arising on proved or admitted facts which will be finally determinative of the case, or if consideration is necessary to serve the ends of justice or to prevent a denial of fundamental rights," we will deal with the constitutional issue. *State v. Anderson,* 12 Kan. App. 2d 342, 343, 744 P.2d 143 (1987). The defendant suggests that we apply the exception to the rule because of the importance of the issue and of the fundamental rights involved. We are also advised that the court orders directing defendants

to provide semen samples are common in Sedgwick County, and we should address the issue for these reasons.

We have determined that the ends of justice and the importance of the issue involved require that we deal with the constitutional question raised. In so doing, we are mindful that the order to provide the sample was not objected to by the defendant. We are further mindful of the fact that no attempt was made to enforce the order. The defendant refused to comply, and no move was made to hold him in contempt or to force medical extraction of the semen upon his refusal. However, we surmise that the existence of the order played a very large part in the denial of the motion in limine. To properly deal with that issue, we will examine the constitutional ramifications of the court order. In doing so, we caution that our analysis focuses only on the factual pattern presented on this appeal.

The State, in its brief, has only addressed a possible Fifth Amendment violation. It is clear that the court's order did not violate the defendant's right against self-incrimination. The order requiring the defendant to provide a semen sample did not compel him to testify against himself or provide evidence of a testimonial or communicative nature. It, therefore, could not have violated his Fifth Amendment rights. See *Schmerber v. California*, 384 U.S. 757, 765, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966).

The Supreme Court of the United States in *Schmerber* held that, as a general proposition, the procedures employed in obtaining bodily fluids constitute an intrusion into the human body and depend upon a seizure of the person. For those reasons, such procedures have been held by the Court to be governed by the Fourth Amendment protection against unreasonable searches and seizures. 384 U.S. at 767-68. The Court has further indicated that these procedures also involve an individual's right to privacy. *Skinner v. Railway Labor Exec. Assn.*, 489 U.S. 602, 616, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989).

Not every intrusion into the human body to retrieve evidence is unreasonable and prohibitive. *Schmerber* involved a question of whether the removal of blood through the use of a needle in a DUI case was prohibited. The court held that it was not because, among other reasons, the withdrawal of blood was done by a physician, "in a simple, medically acceptable manner in a

hospital environment." 384 U.S. at 759. The rationale of the court was to constrain only those intrusions into the body which were "not justified in the circumstances, or which are made in an improper manner." 384 U.S. at 768. While indicating that the Fourth Amendment did not prohibit bodily intrusions to retrieve evidence, the court said:

"The interests in human dignity and privacy which the Fourth Amendment protects forbid . . . intrusions [beyond the body's surface] on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." 384 U.S. at 769-70.

The court then upheld the withdrawal of blood for several reasons, one of which was that the State had shown that relevant evidence would be obtained and would disappear unless the search was conducted immediately.

It is apparent that, while the court in *Schmerber* opened the door for bodily intrusions to obtain evidence, it also set limits beyond which the State would not be permitted to pass. *Schmerber* established a balancing test between the State's need for evidence and the substantial privacy interests of individuals. This balancing test was applied again in *Skinner*, 489 U.S. at 616, in which the court held that the government's interest in regulating the conduct of railroad employees who were engaged in safety-sensitive tasks justified and permitted Federal Railroad Administration safety regulations mandating or authorizing alcohol and drug tests of employees without warrants and without individualized suspicion.

These perimeters were further explored in *Winston v. Lee*, 470 U.S. 753, 760, 763, 84 L. Ed. 2d 662, 105 S. Ct. 1611 (1985). In that case, the State sought a court order requiring a defendant to undergo surgery under general anesthetic so that the State might retrieve a bullet fragment in the defendant's shoulder for use as evidence in the trial of the defendant for robbery. In this case, the Court applied the *Schmerber* balancing test and ruled that the Commonwealth of Virginia could not compel a defendant to have surgery to remove the bullet. The Court held that the medical risk of surgery involving a general anesthetic, although apparently not extremely severe, was uncertain; the intrusion into

the defendant's body was severe; and the Commonwealth failed to show a compelling need for the evidence. As a result, the Court determined that the proposed surgery would be an unreasonable search under the Fourth Amendment. 470 U.S. at 766-67.

As we read *Winston*, the case turns upon the failure of the State to show a compelling need for the evidence. After discussing the issue of forced surgery in general, the Court said:

"The other part of the balance concerns the Commonwealth's need to intrude into respondent's body to retrieve the bullet. The Commonwealth claims to need the bullet to demonstrate that it was fired from Watkinson's gun, which in turn would show that respondent was the robber who confronted Watkinson. However, although we recognize the difficulty of making determinations in advance as to the strength of the case against respondent, petitioners' assertions of a compelling need for the bullet are hardly persuasive. The very circumstances relied on in this case to demonstrate probable cause to believe that evidence will be found tend to vitiate the Commonwealth's need to compel respondent to undergo surgery. The Commonwealth has available substantial additional evidence that respondent was the individual who accosted Watkinson on the night of the robbery. No party in this case suggests that Watkinson's entirely spontaneous identification of respondent at the hospital would be inadmissible. In addition, petitioners can no doubt prove that Watkinson was found a few blocks from Watkinson's store shortly after the incident took place. And petitioners can certainly show that the location of the bullet (under respondent's left collarbone) seems to correlate with Watkinson's report that the robber 'jerked' to the left. . . . The fact that the Commonwealth has available such substantial evidence of the origin of the bullet restricts the need for the Commonwealth to compel respondent to undergo the contemplated surgery.

"In weighing the various factors in this case, we therefore reach the same conclusion as the courts below. The operation sought will intrude substantially on respondent's protected interests. The medical risks of the operation, although apparently not extremely severe, are a subject of considerable dispute; the very uncertainty militates against finding the operation to be 'reasonable.' In addition, the intrusion on respondent's privacy interests entailed by the operation can only be characterized as severe. On the other hand, although the bullet may turn out to be useful to the Commonwealth in prosecuting respondent, the Commonwealth has failed to demonstrate a compelling need for it. We believe that in these circumstances the Commonwealth has failed to demonstrate that it would be 'reasonable' under the terms of the Fourth Amendment to search for evidence of this crime by means of the contemplated surgery." 470 U.S. at 765-66.

We think the rationale of *Winston* applies in the instant matter. The court order required the defendant to provide a semen sam-

ple. The defendant argues that he considered the physical act necessary to provide this sample to be humiliating and degrading. He argues that the court's order required him to either perform an act he considered degrading or to suffer the risk of the jury being told that he had refused to provide the sample requested and, thereby, conclude that such a refusal was evidence of guilt. He further points out that the State could not demonstrate a compelling need for the evidence he refused to provide.

We recognize that the sample defendant was requested to provide intrudes substantially greater on his privacy rights and his right to dignity as a human being than would an order compelling a blood sample. Indeed, the requirement of the semen sample is a much more serious intrusion into the defendant's right to privacy and dignity than an order requiring that he provide samples of blood, saliva, and pubic hair. This order involved a function which the Supreme Court of California in *People v. Scott*, 21 Cal. 3d 284, 294, 145 Cal. Rptr. 876, 578 P.2d 123 (1978), referred to as the "most intimate of bodily functions, traditionally and universally regarded as private, we think it is as extreme as the forced regurgitation at issue in [*People v.*] *Bracamonte* [, 15 Cal. 3d 394, 124 Cal. Rptr. 528, 540 P.2d 624 (1975)] and *Rochin* [*v. California*, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952)], both *supra.*" We are of the opinion that such an order should not be issued absent a strong demonstration by the State of the most compelling need. Certainly, at a minimum, such an order should not be issued unless the State proves that the sample ordered to be given will provide substantial, and not merely cumulative, evidence.

We hold that, under the facts presented, the order by the district court requiring the defendant to provide a semen sample violated the defendant's Fourth Amendment rights to be secure against unreasonable searches and seizures. Our conclusion is limited to the facts presented in the instant matter. These facts indicate that the State made no evidentiary showing of the need for a semen sample, and further indicate that the State's own evidence disclosed that the semen sample, had it been provided, would have been of little or no probative value. The results of the serological tests performed by the State and introduced at the trial would have been no different had the sample been given.

Under such circumstances, we hold that the State failed to show a compelling need for the sample, and the balancing test referred to in this opinion requires that we conclude that the State's need for evidence did not, in the instant matter, outweigh the substantial privacy interests of the individual.

Since the court order in this case violated the defendant's Fourth Amendment rights, it follows that the court erred not only in issuing that order but in refusing to sustain the defendant's motion in limine. The evidence of the defendant's refusal to provide the semen sample was highly prejudicial as were the references to that refusal in the State's closing argument. We consider the evidence so prejudicial that we hold defendant was denied a fair trial, and we reverse his conviction and remand the matter for a new trial.

## STATE LAW ANALYSIS

Aside from the constitutional analysis, we have concluded that the trial court erred in refusing to sustain defendant's motion in limine on the basis of state law alone.

In *State v. Quick*, 226 Kan. 308, 311, 597 P.2d 1108 (1979), the purpose of a motion in limine was discussed by our Supreme Court as follows:

"The purpose of a motion in limine is to assure all parties a fair and impartial trial by prohibiting inadmissible evidence, prejudicial statements, and improper questions by counsel. It is generally agreed a protective order issued on a motion in limine should be granted only when the trial court finds two factors are present: (1) The material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) The mere offer of or statements made during trial concerning the material will tend to prejudice the jury. [Citations omitted.] The material to which the motion in limine is addressed may be either inadmissible under an established rule of evidence, such as the hearsay rule, or it may be excludable under a statute, such as K.S.A. 60-445, because its probative value is substantially outweighed by its tendency to prejudice.

"As previously mentioned the primary purpose of the motion in limine is to prevent prejudice during trial. Its use should be strictly limited to accomplish that purpose. It must not be used to choke off a valid defense in a criminal action. See *State v. Bradley*, 223 Kan. 710, 713, 576 P.2d 647 (1978), where this court found that the motion in limine had been used to exclude relevant and material information pertaining to the defense, and that defendant's fundamental right to a fair trial had been violated."

We have concluded that the probative value of the evidence defendant sought to have excluded under the motion in limine was substantially outweighed by the tendency of that evidence to prejudice the defendant's trial. For that reason, we believe the motion in limine should have been granted and that the trial court erred in refusing to do so.

There can be little doubt that introduction of defendant's refusal to provide a semen sample carried with it an implication of guilt. See *State v. Haze*, 218 Kan. 60, 63, 542 P.2d 720 (1975). There also can be little doubt but that, considering the serologist's testimony in this case, the probative value of the semen sample, even if it had been given, was zero.

Defendant argues that the probative value of the evidence sought was zero and that nothing in the record shows that the request for the semen sample served any other purpose other than to humiliate and prejudice him. Defendant contends, and we agree, the order placed him in a situation in which he would either be forced to comply with the court order and commit a humiliating act of coerced masturbation or place himself in a vulnerable position where the State could argue that his failure to provide semen was evidence of guilt.

The State relies on *State v. Haze* in its argument that the order was lawful and that the defendant's refusal was relevant and probative to show his consciousness of guilt.

We do not agree with the State's reading of *Haze*. In *Haze*, the Kansas Supreme Court held that a prosecutor's comments on the defendant's refusal to provide a handwriting exemplar were admissible in evidence against him. The court reasoned that, since exemplars are not self-incriminating testimony under the Fifth Amendment, the defendant could not refuse to provide one with impunity. The court stated the defendant's refusal

"is in substance an indication of the conduct of the accused and it is this conduct, rather than the oral utterance, which provides the basis for the inference of a consciousness of guilt. Thus, the refusal should be treated as an act or conduct indicating consciousness of guilt, rather than a self-incriminating statement [under the Fifth Amendment]." *State v. Haze*, 218 Kan. at 63.

We believe *Haze* is completely distinguishable from the case at hand. In *Haze*, the exemplar sought would have provided

relevant evidence because it could have presented exculpatory or inculpatory evidence linking the defendant to evidence found at the scene of the crime. In the matter now before this court, there has been no showing that defendant's semen sample would have been relevant for any purpose. The test conducted by the serologist could have been conducted on any of the bodily fluid samples Williams submitted. Thus, it appears to us that the probative value of the evidence was very low and the prejudicial effect of admitting the evidence was very high. It is exactly this type of circumstance in which a trial court should grant a motion in limine. In refusing to grant the motion in limine, the trial court committed error.

The result of our conclusion on this issue is that the evidence of defendant's refusal should not have been admitted, and the prosecution should not have been allowed to comment on the defendant's refusal in closing argument.

The United States Supreme Court in *Schmerber*, 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966), found that requiring the defendant to provide a blood sample did not violate his Fifth Amendment rights against self-incrimination. The Court stated that there was "[n]ot even a shadow of testimonial compulsion upon or enforced communication by the accused," because the blood test depended upon chemical analysis alone rather than requiring Schmerber to be a witness against himself. 384 U.S. at 765. In a footnote, the Court indicated a different question would be presented if the State tried to show Schmerber incriminated himself when told he would be tested. The Court stated:

"Such incriminating evidence may be an unavoidable by-product of the compulsion to take the test, especially for an individual who fears the extraction or opposes it on religious grounds. If it [the State] wishes to compel persons to submit to such attempts to discover evidence, the State may have to forgo the advantage of any *testimonial* products of administering the tests—products which would fall within the privilege. Indeed, there may be circumstances in which the pain, danger, or severity of an operation would almost inevitably cause a person to prefer confession to undergoing the 'search,' and nothing we say today should be taken as establishing the permissibility of compulsion in that case." 385 U.S. at 765 n.9.

Thus, we have no hesitation in holding that, not only was it error to admit evidence of the defendant's refusal to provide the

sample, it was error to permit the State to comment on that refusal in its closing argument.

It is suggested to us that the error should be considered harmless. We are cited to *State v. Bell*, 239 Kan. 229, 235, 718 P.2d 628 (1986), which establishes the rule: "Errors which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining do not require reversal when substantial justice has been done." This is essentially the harmless error rule, which has been applied by this court and the Kansas Supreme Court on many different occasions.

The harmless error concept is, at times, very troublesome. It permits an appellate court to sweep trial error under the rug and pretend that it did not happen. On occasions, the error is clearly de minimus and the rule functions well. However, in gray areas, the rule can be used to sustain a conviction under extremely troubling circumstances.

This appeal presents a particularly troublesome issue on harmless error. In approaching the harmless error issue, we are concerned about the arguments of the prosecutor to the jury in closing arguments. Because of what we consider to be the extremely prejudicial nature of the comments by the prosecutor, we adopt the rule from *State v. Zamora*, 247 Kan. 684, 803 P.2d 568 (1990), in considering whether the error in this case was indeed harmless. In *Zamora*, the Kansas Supreme Court held:

"In deciding whether improper remarks by the prosecution during closing arguments constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt. *State v. Buckland*, 245 Kan. 132, 141, 777 P.2d 745 (1989); *State v. Abu-Isba*, 235 Kan. 851, 859, 685 P.2d 856 (1984)." 247 Kan. at 690.

Because the prejudicial evidence in this case was not only brought to the jury's attention by the State in proving its case but was also brought to the attention of the jury by the prosecutor on three occasions in closing argument, we adopt the standard which requires that we must be convinced beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. We are unable to conclude beyond a reasonable doubt that the error was harmless.

As pointed out earlier in this opinion, the defendant did present a defense. The witness who testified on behalf of the defendant was declared to be credible and believable by the trial court. The question of defendant's guilt or innocence was, therefore, not simply a foregone conclusion. The jury had to determine whether it believed the evidence offered by the prosecution or that offered by the defense. Because the jury rejected the defendant's version of the events, we have no way of knowing what weight the jury may have placed on the fact that the defendant had refused to provide a semen sample. The prosecution wrongfully implied to the jury that the semen sample was somehow very relevant and would have provided proof of the defendant's guilt. This implication is simply not borne out nor is it justified by the evidence presented by the State's own expert witness. Under the circumstances, we consider the error so prejudicial and so damaging to the entire trial that we are unwilling to stamp that error as being merely harmless error and sweep it under the rug.

We conclude that defendant's conviction for rape must be reversed as the error may very well have affected the outcome of the trial. See *State v. Colwell*, 246 Kan. 382, 386-87, 790 P.2d 430 (1990).

Our decision rests primarily on the proposition that the State failed to show that it had a compelling need for the evidence the defendant refused to provide. Indeed, the State failed to show that the semen sample had any probative value or relevance to the issue of defendant's guilt. At the very best, the evidence produced by a semen sample would have been cumulative to the evidence produced by the blood and saliva samples. The State, in its desire to obtain a conviction, was overzealous to a fault. There was no need for the State to engage in prosecutorial overkill by emphasizing defendant's refusal to provide the sample. The same result might have been as likely obtained without attempting to mislead and prejudice the jury as to the effect of defendant's refusal to provide a semen sample. We see, from time to time, overzealous prosecutors who exceed the bounds of propriety in their desire to obtain a conviction. We can only suggest that this approach to prosecution will inevitably result in action such as we are forced to take in the matter under consideration.

## OTHER PROSECUTORIAL MISCONDUCT

The defendant argues that there was additional prosecutorial misconduct in the closing argument at his trial. He is particularly upset at the following statement made by the prosecutor in closing arguments: "The defense even acknowledges that there was sexual contact." The defendant argues this was a glaring misstatement of the evidence and was prosecutorial misconduct. We do not agree. We consider the prosecutor's remarks to be in rebuttal to remarks of defense counsel during the closing argument of defense counsel.

To the extent that it remains relevant in view of our action on the other issues of this case, we hold that the prosecutor did not prejudice the defendant in closing argument by the statement quoted above.

Reversed and remanded.