No. 87,268

STATE OF KANSAS, *Appellee*, v. ROGER L. MORRIS, *Appellant*.
(72 P.3d 570)

YALE LAW LIBRARY

Opinion filed July 11, 2003.

*Peter T. Maharry*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with him on the brief for appellant.

*Bradley R. Burke,* assistant district attorney, argued the cause, and *Christine E. Kenney*, district attorney, and *Carla J. Stovall* and *Phill Kline*, attorneys general, were with him on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Roger L. Morris appeals from his jury convictions of attempted manufacture of a controlled substance, possession of drug paraphernalia, possession of methamphetamine, and possession of amphetamine.

Morris argues the trial court erred in failing to suppress the evidence obtained when a sheriff's officer, without a reasonable suspicion of illegal conduct by Morris, activated his emergency lights and approached Morris who was sitting in his pickup which was legally parked in a public place. Morris also argues there was prosecutorial misconduct during the closing argument.

On direct appeal, the Court of Appeals affirmed Morris' convictions, holding that the trial court had properly denied Morris' motion to suppress evidence and that the prosecutor's improper comments during closing argument did not warrant reversal. Pursuant to K.S.A. 20-3018(b), this court granted Morris' petition for review. We reverse the trial court and the Court of Appeals on the suppression issue and, as a result of that determination, do not reach the prosecutorial misconduct issue.

## FACTS

On March 24, 1999, Douglas County sheriff's officers were investigating a possible methamphetamine lab in Eudora. Around 6 p.m., Undersheriff Massey and other officers were conducting surveillance of an apartment while waiting for a search warrant. When Kim Souza left the apartment and drove to Lawrence, Massey and other officers followed her and saw her stop and speak to a man in a green pickup. Massey recognized that man as Roger Morris. Souza and Morris spoke briefly, and then drove away. The officers attempted to follow, but were unsuccessful due to traffic.

Massey next located Morris around 8:40 p.m. when he found Morris parked in his pickup with the engine running on a rocky jetty-breaker area at the Douglas County State Lake. Massey, who was in an unmarked vehicle, called in Detective Pollock and Corporal Bunting who were driving a marked unit. Around 9:15 p.m., the officers pulled in behind Morris' pickup "and activated the red lights and illuminated the back of his pickup with . . . spotlights." At this point, Morris' engine was not running. While Bunting approached the driver's door of the pickup to obtain Morris' identification, Massey and Pollock approached the passenger side door. Both Massey and Pollock noticed a chemical odor coming from inside the truck; they had smelled a similar odor associated with methamphetamine labs. The officers also observed a Coleman camp stove sitting on top of a closed canvas bag on the passenger side floorboard.

Although Morris was initially cooperative, he became upset when he saw officers looking inside his truck. After Morris reached toward the passenger seat several times, Massey asked Bunting to have Morris step out of the vehicle.

Once Morris had been removed from the vehicle, Massey looked inside the cab of the truck with a flashlight and saw two canisters of fuel for the camp stove. Massey observed a glass coffeepot with a reddish-brown stain he believed was consistent with the red phosphorous method of methamphetamine production. On the ground near the driver's door, he also saw a baggie with a corner cut off. He explained that the corners of baggies are commonly cut off and

used to package narcotics. The baggie did not appear to be weathered, and there was no other debris near the vehicle.

Based upon their observations of the chemical smell, the camp stove, other items inside the pickup, and the lack of camping equipment, the officers decided to search the pickup. After waiting for assistance in collecting evidence, officers found "a fairly complete meth lab" including such items as antifreeze, iodine, lye, acetone, matchbooks, scales, and syringes, all of which are used in the manufacture of methamphetamine. They also found several jars of liquid which were ultimately determined to be amphetamine and methamphetamine. Many of these items were found inside the canvas bag in Morris' pickup.

Morris filed a motion to suppress the evidence which was seized during the search of his pickup, alleging that he was unreasonably seized when officers removed him from his pickup and any items seized during the ensuing search should be suppressed as fruit of the poisonous tree. Morris also argued the search was unreasonable and illegal because the officers did not obtain a warrant, exigent circumstances did not exist, and probable cause did not exist. Finally, Morris argued that the search of his duffel bag was unreasonable and unlawful.

The fact that the officers had activated their emergency lights when they pulled in behind Morris' pickup was not mentioned during the testimony offered at the suppression hearing. After that hearing, the trial court asked the parties to brief the issues involved. The first mention of emergency lights was in the State's brief.

Then, at trial, Undersheriff Massey testified the officers pulled behind Morris' pickup "and activated the red lights and illuminated the back of his pickup with . . . spotlights."

The trial court denied Morris' pretrial motion to suppress, focusing on whether exigent circumstances existed to justify searching his vehicle without a warrant. The trial court found that the officers had probable cause to search and that the vehicle was readily mobile; therefore, the officers could search the vehicle without a warrant. The trial court ruled that since the search of the pickup was proper, the search of the duffel bag found inside the pickup was also proper.

On direct appeal, the Court of Appeals affirmed Morris' convictions in an unpublished decision, *State v. Morris*, No. 87,268, filed November 8, 2002. Regarding the suppression issue, Morris made two arguments to the Court of Appeals: (1) that the police officers had illegally seized him without reasonable suspicion when they pulled up behind his parked vehicle and activated their emergency lights, and (2) that the police officers lacked probable cause to search his vehicle without a warrant. *Morris*, Slip op. at 4. The Court of Appeals rejected both arguments. However, in his petition for review, Morris challenges only the first portion of the ruling.

In resolving the issue of when the seizure occurred, the Court of Appeals noted the cases from other jurisdictions cited by Morris which supported his position that a voluntary encounter becomes a seizure when officers activate their emergency lights. However, the court cited *State v. Weaver*, 259 Kan. 844, 849, 915 P.2d 746 (1996), for the premise that, in Kansas, the activation of emergency lights is not a show of authority sufficient to constitute a seizure under the Fourth Amendment to the United States Constitution. Applying *Weaver* to the facts of the case, the Court of Appeals held that Morris was not seized until he complied with the officer's request to produce identification. By the time officers requested Morris' identification, they had already smelled a chemical odor coming from inside the truck and had seen the camp stove in plain view on the passenger floorboard, and these facts established a reasonable suspicion of criminal activity sufficient to further detain Morris. *Morris*, Slip op. at 11-13.

## STANDARD OF REVIEW

On a motion to suppress evidence, this court reviews the facts underlying the trial court's suppression decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. In this case there is no dispute as to the facts; therefore, the ultimate determination of suppression is a legal question requiring this court's independent constitutional appraisal of the effects of those facts. *State v. Gray*, 270 Kan. 793, 796, 18 P.3d 962 (2001).

## ISSUE NOT RAISED BELOW

Before the trial court, Morris argued that his detention was illegal because the officers did not have reasonable suspicion to remove him from the vehicle at the time they noticed the chemical smell and the camp stove in his pickup. He did not argue that officers had detained him at the moment they pulled up behind him and activated their emergency lights.

After citing the general rule that issues not raised below are precluded from appellate review, the Court of Appeals noted that exceptions are made where the question involved is a strictly legal one that will be determinative of the case or where consideration of the issue is necessary to serve the interests of justice or prevent the denial of fundamental rights. The Court of Appeals found that the interests of justice would best be served by considering Morris' arguments. *Morris*, Slip op. at 6-7.

In addition, we note that Morris failed to lodge a contemporaneous objection at trial when the evidence regarding the emergency lights was admitted. Consequently, this court would be justified in ruling that Morris failed to preserve the issue for appeal. However, the Court of Appeals considered the question of when the seizure occurred and resolution of that issue framed the Court of Appeals' decision. Our review is, therefore, necessitated, although we recognize the issues on appeal were not presented for the trial court's consideration.

We also note several additional factors which weigh in favor of considering Morris' new arguments. First, the fact that officers activated their emergency lights when they pulled in behind Morris was mentioned during the trial, but not during the suppression hearing. This may explain why Morris did not argue that fact in his motion to suppress. Second, Morris did raise the general question of the validity of his detention in his motion to suppress. Third, the issue arises on uncontested facts and will be determinative of the case. Fourth, the State has responded to Morris' argument on the merits and has never complained that Morris failed to preserve the issue. Fifth, the issue of whether a seizure occurs when emergency lights are activated by law enforcement personnel raises con-

stitutional issues which should be resolved in the interests of justice and to prevent the denial of fundamental rights. See *State v. Clemons*, 251 Kan. 473, 483, 836 P.2d 1147 (1992); *State v. Williams*, 15 Kan. App. 2d 656, 663-64, 815 P.2d 569 (1991) (cases cited by Court of Appeals in support of its decision to consider issue and dealing with Fourth Amendment claims raised for the first time on appeal; legal question arising on uncontroverted facts).

## UNLAWFUL STOP OR SEIZURE

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures" of "persons." *Henry v. United States*, 361 U.S. 98, 100, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959). Section 15 of the Kansas Constitution Bill of Rights provides protection identical to that provided under the Fourth Amendment to the United States Constitution. See *State v. Johnson*, 253 Kan. 356, 362, 856 P.2d 134 (1993) ("[T]he wording and scope of the two sections are identical for all practical purposes. If conduct is prohibited by one it is prohibited by the other.").

The key to applying these protections, in light of Morris' argument, is determining when the seizure of his person occurred, because it "is at that critical time" that the officers must have had knowledge of facts giving rise to a reasonable and articulable suspicion that the defendant had committed, was committing, or was about to commit a crime. *State v. Guy*, 242 Kan. 840, 843, 752 P.2d 119 (1988); see *Weaver*, 259 Kan. at 852.

In 1968, in *Terry v. Ohio*, the United States Supreme Court stated a person is seized, thereby triggering a Fourth Amendment analysis of the police action, "when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Subsequently, a different statement of the test was articulated by Justice Stewart in his opinion in *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), and later adopted by a majority of the Supreme Court in *INS v. Delgado*, 466 U.S. 210, 215, 80 L. Ed. 2d 247, 104 S. Ct. 1758 (1984). Justice Stewart wrote that a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a rea-

sonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.

In *California v. Hodari D.*, 499 U.S. 621, 113 L. Ed. 2d 690, 111 S. Ct. 1547 (1991), the Supreme Court reviewed the test set out in *Mendenhall* and clarified that *Mendenhall*

"states a *necessary*, but not a *sufficient*, condition for seizure—or more precisely, for seizure effected through a 'show of authority.' *Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari*, 499 U.S. at 628.

In justifying the statement that a show of authority was necessary, but not sufficient, the majority in *Hodari* discussed prior cases. First, the Supreme Court distinguished *Michigan v. Chesternut*, 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1984), where the Court held that the police cruiser's slow following of the defendant did not convey the message that he was not free to disregard the police and go about his business.

Next, the majority in *Hodari* discussed *Brower v. Inyo County*, 489 U.S. 593, 596, 103 L. Ed. 2d 628, 109 S. Ct. 1378 (1989), in which police cars with flashing lights pursued the decedent for 20 miles during which he did not stop until fatally crashing into a police-erected blockade. The majority in *Hodari* noted: "We did not even consider the possibility that a seizure could have occurred during the course of the chase because, as we explained, that 'show of authority' did not produce his stop." *Hodari*, 499 U.S. at 628 (citing *Brower*, 489 U.S. at 597).

Applying the same reasoning in *Hodari*, the Supreme Court considered when a seizure occurred where Hodari took flight, tossed away a small rock of crack cocaine, and then was tackled by officers. The Supreme Court stated: "[A]ssuming that [the officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled." *Hodari*, 499 U.S. at 629.

Therefore, under the holding of *Hodari*, a seizure of a person occurs if there is the application of physical force (499 U.S. at 624) or if there is a show of authority which, in view of all the circum-

stances surrounding the incident, would communicate to a reasonable person that he or she is not free to leave (499 U.S. at 628) and the person submits to the show of authority (499 U.S. at 629).

Thus, as the State notes, voluntary encounters are not considered seizures and are not protected by the Fourth Amendment to the United States Constitution. *State v. Crowder*, 20 Kan. App. 2d 117, 119, 887 P.2d 698 (1994) (citing *United States v. Ward*, 961 F.2d 1526, 1529 [10th Cir. 1992]). The State describes the officers' initial contact with Morris as a voluntary encounter. In support of its position, the State cites *State v. Reason*, 263 Kan. 405, 951 P.2d 538 (1997), in which this court quoted the United States Supreme Court in *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991), for the proposition that

" 'a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," [citation omitted], the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.' " *Reason*, 263 Kan. at 410.

In *State v. Reason*, police approached a vehicle parked in a public parking lot where two persons were sleeping inside the car with the doors open. The police parked behind the vehicle, but the vehicle would have been able to leave by pulling forward. The officers woke the defendant to ask him why the vehicle was there and if he was okay. This court held the initial approach and questioning was a voluntary encounter and not a seizure of the defendant requiring reasonable suspicion. 263 Kan. at 412.

In similar situations, we have found an encounter to be voluntary and not a seizure. See *State v. Baacke*, 261 Kan. 422, 437-38, 932 P.2d 396 (1997) ( police notice car parked in the city park around 3 a.m., approach, and ask for identification; where defendant free to terminate, the encounter it is not a seizure); *State v. Marks*, 226 Kan. 704, 707-10, 602 P.2d 1344 (1979) (officer asking for identification from two men in parked car not a seizure).

However, Morris argues that his contact was not voluntary because there was a show of authority. In *Chesternut*, 486 U.S. at 575, the Supreme Court noted some situations which would con-

stitute a show of authority, including activation of sirens or flashers, a command to halt, a display of weapons, or attempt to control the ability to flee or the direction of travel during a chase. Consistent with this, in *State v. Epperson*, 237 Kan. 707, 708, 703 P.2d 761 (1985), we found a "stop" when an officer blocked a vehicle before approaching the car and "cut off their avenue of escape" by leaving his door open. 237 Kan. at 714.

We hold that Morris' encounter was not voluntary, but rather occurred under a show of authority. The officers' conduct, the activation of the emergency lights in a remote area off a roadway, was a show of authority which would communicate to a reasonable person that there was an intent to intrude upon freedom of movement. "Few, if any, reasonable citizens, while parked, would simply drive away and assume that the police, in turning on the emergency flashers, would be communicating something other than for them to remain." *Lawson v. State*, 120 Md. App. 610, 617, 707 A.2d 947 (1998). In fact, it is unlawful for a driver to fail to stop when a police officer signals the driver by using emergency lights. K.S.A. 8-1568 (fleeing and eluding).

Since we find that there was a "show of authority," as required by the holding in *Mendenhall*, 446 U.S. 544, we must consider the holding in *Hodari* and determine when Morris "compl[ied] with the injunction" to complete the seizure. In *Hodari,* the respondent's contention that he had been seized when police began to pursue him was rejected because Hodari did not yield to the show of authority. The Supreme Court stated:

"The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. . . . It does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure. . . . An arrest requires *either* physical force . . . *or*, where that is absent, submission to the assertion of authority." 499 U.S. at 626.

In this case, the Court of Appeals determined that there was not submission until Morris provided his identification. Slip op. at 11. In doing so, they relied on *Weaver*, 259 Kan. 844. In *Weaver*, the officer decided to stop the defendant's vehicle and activated his emergency lights. The defendant, however, did not submit to that

show of authority by pulling over to the side of the roadway. Instead, he sped away and a chase ensued during which the defendant drove through a private yard and into a wheat field. This court, relying upon *Hodari*, held that the stop occurred not when the officer activated his emergency lights, but when the defendant finally submitted to the officer's authority by stopping in the wheat field and providing his identification. 259 Kan. at 849. Thus, the officer's observations during the intervening chase could provide the basis for his reasonable suspicion of criminal activity. 259 Kan. at 853. Relying upon this analysis, the Court of Appeals concluded: "[L]ike the defendant in *Weaver*, Morris could have ignored the flashing lights and refused to provide his identification upon their approach of his vehicle." *Morris*, Slip op. at 11.

Morris argues that the Court of Appeals' ruling misinterprets *Weaver*, which is distinguishable on its facts. He contends that the activation of the officers' emergency lights was a clear signal he should stay where he was and that he submitted to the officers' authority by not attempting to leave.

Morris' argument has merit. *Weaver* and *Hodari* announced a rule intended to address cases where a defendant, after a show of authority, does not yield to the officer's authority but takes other action, such as abandoning evidence or fleeing, before finally submitting to the officer's show of authority. The *Hodari* "test is not helpful [in situations] . . . in which there is never any movement at all by the suspect." 4 LaFave, Search and Seizure § 9.3(d) p. 132 and 2003 Pocket Part p. 54 (1996). However, we note that the United States Supreme Court, in *Hodari*, carefully distinguished the facts of that case from a case where there was immediate, passive submission. For example, the Supreme Court stated: "The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not." 499 U.S. at 626. Other statements of the Supreme Court's holding also contained qualifications such as "*since Hodari did not comply with that injunction* he was not seized until he was tackled." 499 U.S. at 629.

Where there is neither force nor obvious words or actions of submission, some courts have applied the *Mendenhall* approach without reference to *Hodari*. *E.g., United States v. Buchanon*, 72 F.3d 1217 (6th Cir. 1995). Other courts have determined that the individual's inaction, albeit passive, is a form of compliance and a submission to authority. *E.g., Lawson*, 120 Md. App. at 617-18. Applying one analysis or the other, most appellate courts considering the issue have concluded a seizure occurs when the officer activates emergency lights. See *Hammons v. State*, 327 Ark. 520, 528, 940 S.W.2d 424 (1997) (defendant sitting in parked automobile was seized when police activated blue light; light was display of authority that would indicate to reasonable person he was not free to leave); *People v. Bailey*, 176 Cal. App. 3d 402, 406, 222 Cal. Rptr. 235 (1985) (officer pulled in behind parked car and activated emergency lights; defendant seized, as reasonable person would not have felt free to leave); *State v. Donahue*, 251 Conn. 636, 643, 742 A.2d 775 (1999) (defendant was seized when officer pulled up behind parked vehicle and activated red, yellow, and blue flashing lights); *Hrezo v. State*, 780 So. 2d 194, 195 (Fla. Dist. App. 2001) (when a police officer turns on the emergency and takedown lights to a lawfully parked vehicle, a reasonable person would expect to be stopped if he or she drove away); *Lawson*, 120 Md. App. at 616-17 (the activation of the emergency lights was a show of authority that constituted a seizure because it communicated to a reasonable person in the parked car that there was an intent to intrude upon the defendant's freedom to move away); *State v. Walp*, 65 Or. App. 781, 784, 672 P.2d 374 (1983) (use of emergency lights after defendant had voluntarily stopped was sufficient show of authority and reasonable person would not have felt free to leave); *State v. Gonzalez*, 52 S.W.3d 90, 97 (Tenn. Crim. App. 2000) (a police officer clearly initiates a seizure by turning on his blue lights behind a parked vehicle because the lights convey the message that the occupants are not free to leave); *State v. Burgess*, 163 Vt. 259, 261, 657 A.2d 202 (1995) (even if officer subjectively intends to activate his blue lights for safety reasons, the use of the lights on the defendant served as a restraint to prevent his departure from the pull-off area of the road); *Wallace v. Com.*, 32 Va. App. 497, 528 S.E.2d

739 (2000) (driver of parked vehicle seized because a reasonable person with a police cruiser parked behind him with its emergency lights flashing would not have felt free to leave); *State v. Stroud*, 30 Wash. App. 392, 396, 634 P.2d 316 (1981) (occupants of parked vehicle seized at moment where officers pulled up behind parked vehicle and switched on flashing light because "the officers' attempt to summon the occupants of the parked car with both their emergency lights and high beam headlights constituted a show of authority sufficient to convey to any reasonable person that voluntary departure from the scene was not a realistic alternative" and, had driver attempted to leave after being so signaled, he could arguably have been charged with misdemeanor).

We join this line of cases in terms of outcome, doing so by following the line of cases which hold that *Hodari*, and in this state our decision in *Weaver*, requires a finding that the accused submitted to the show of authority. In this case, Morris did not attempt to leave when officers pulled in behind him with their emergency lights flashing. Upon seeing the flashing emergency lights of the officer's patrol car, Morris complied with the officer's "show of authority" enjoining him to remain. He did not flee; instead, he complied with the assertion of authority. We find that Morris was seized within the contemplation of the Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights when the lights were activated and he submitted by not fleeing.

We do note that some courts have held that activation of emergency lights is not a seizure because the lights may be activated for safety reasons. See *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir. 1995) (no behavior by officer to differentiate encounter from one where officer approaches stranded motorist to offer assistance), and *State v. Baldonado*, 115 N.M. 106, 110, 847 P.2d 751 (1992) (manner in which police officers approach car after it has been stopped in response to officers' use of their emergency lights is controlling for purposes of determining whether stop is "seizure" that would require probable cause or reasonable suspicion; trial court should ordinarily find "seizure" if officers approach in accusatory manner, asking for license and registration and ac-

count of occupants' activities, while "seizure" should ordinarily not be found if officers approach in deferential manner and ask first whether occupants need help).

In this case, no such question arises because Morris was parked in a jetty area of the Douglas County State Lake where a reasonable person would not believe that the lights had been activated for safety reasons. There was no showing that other traffic necessitated activating the emergency lights. Thus, we do not reach this question.

Under the facts of this case, Morris was seized at the moment when officers pulled up behind him and activated their emergency lights. No reasonable person would have felt free to terminate the encounter by driving away, and Morris complied with the officers' show of authority through his tacit submission. The only remaining question, then, is whether officers had reasonable suspicion of criminal activity at the time they pulled in behind Morris.

## REASONABLE SUSPICION

The State argues that if this court finds that the seizure occurred at the moment when officers activated their emergency lights, officers had reasonable suspicion even at that early stage because of "the totality of their knowledge." The State does not elaborate on what that knowledge was.

This court stated the standard for determining reasonable suspicion in *State v. Slater*, 267 Kan. 694, Syl. ¶¶ 1, 2, 986 P.2d 1038 (1999):

"A law enforcement officer may stop any person in a public place based upon specific and articulable facts raising a reasonable suspicion that such person has committed or is about to commit a crime."

"Reasonable suspicion is a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors, quantity and quality, are considered in the totality of the circumstances that must be taken into account when evaluating whether reasonable suspicion exists."

Testimony at the suppression hearing reveals that officers had some knowledge of Morris' prior involvement with methamphetamine. Undersheriff Massey testified that he knew the Drug Enforcement Unit had executed a search warrant at Morris' trailer regarding an alleged methamphetamine lab. He did not remember the date of that event, and did not state whether a methamphetamine lab was discovered. Massey stated he had gone to the lake to look for Morris based upon "information from the past" and not based on any tip that Morris was at the lake that particular night. Detective Pollock later clarified that Massey knew Morris had cooked methamphetamine in that location in the past. However, the officers never stated that they had any information that Morris was currently involved in manufacturing methamphetamine. Although officers eventually obtained the search warrant for Souza's apartment and did discover a methamphetamine lab there, that did not happen until later in the evening after officers had already detained Morris.

When asked why he made contact with Morris, Undersheriff Massey answered, "I was attempting to make contact with Mr. Morris who I had seen in that truck earlier talking to Ms. Souza in Lawrence who was the target of a search warrant of ours." He did not articulate any other reason for contacting Morris and admitted that he had not seen Morris engage in any illegal conduct.

A person's mere propinquity to others independently suspected of criminal activity does not, without more, authorize a *Terry* stop unless the officer has reasonable suspicion directed specifically at that person. See *State v. Vandiver*, 257 Kan. 53, 61, 891 P.2d 350 (1995) (discussing *Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 [1979]). Under these circumstances, officers did not have reasonable suspicion that Morris had committed or was about to commit a crime at the time they seized him, *i.e.*, at the moment when they pulled up behind him and activated their emergency lights.

"The exclusionary rule prohibits the admission of the 'fruits' of illegally seized evidence, *i.e.*, any information, object, or testimony uncovered or obtained, directly or indirectly, as a result of the illegally seized evidence or any leads obtained therefrom." *State v.*

*Canaan*, 265 Kan. 835, Syl. ¶ 3, 964 P.2d 681 (1998). Hence, the evidence obtained as a direct result of that illegal seizure should have been suppressed.

We, therefore, reverse the decision of the Court of Appeals and Morris' conviction and vacate his sentence.

Because of this holding, we need not reach the issue of whether there was prosecutorial misconduct in the closing argument.

Reversed and remanded for new trial.

ABBOTT and GERNON, JJ., not participating.

LARSON, S.J., and BRAZIL, S.J., assigned.