No. 66,903

STATE OF KANSAS, *Appellee,* v. GREG WALKER, *Appellant.*
(843 P.2d 203)

Opinion filed December 11, 1992.

*Thomas Jacquinot,* special appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the briefs for appellant.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Greg Walker appeals his jury convictions of two counts of aggravated kidnapping, K.S.A. 21-3421, a class A felony; aggravated criminal sodomy, K.S.A. 21-3506(c), a class B felony; aggravated arson, K.S.A. 21-3719, a class B felony; aggravated burglary, K.S.A. 1991 Supp. 21-3716, a class C felony; and two counts of aggravated assault, K.S.A. 21-3410(a), a class D felony.

He also seeks reversal of the district court's order authorizing the State to prosecute him as an adult.

Defendant's convictions arise out of two separate incidents. The aggravated arson conviction is based on a Molotov cocktail being tossed into the apartment of Kenneth Lowe. The other convictions are based on the forced entry into Jerome Alcorn's apartment and the subsequent conduct toward Alcorn and D.G.

Each of these incidents occurred when defendant was with a group of young men. There was trial testimony about this group's affiliation with the Insane Crips gang, also known as ICG or Crips.

The incident involving the aggravated arson occurred on July 20, 1990. Kenneth Lowe and his roommates had a party at their apartment. After the party was underway, defendant, along with his brother James Walker, Harabia Johnson, Rodney Hooks, and Dejuanaudeiu (Dejuan) Harris, asked if they could join the party. They were told that they were not welcome at the party. They hung around outside and harassed arriving guests.

About 10:00 to 10:30 p.m., they were admitted to the party on the condition that they settle down and stop harassing guests. After being admitted to the party they continued to act up. They

poured beer on the floor, put out cigarettes on the floor, bothered female guests, and stood in a circle singing Crips lyrics to popular tunes.

Lowe and his roommates decided to end the party, and they asked people to leave. After only a few people were left, two carloads of people drove up. James Walker spoke belligerently to a man who got out of one of the cars. Defendant, James Walker, Harabia Johnson, and Dejuan Harris began pushing and hitting people, knocking them to the ground, beating them, "whooping" them with a switch off a tree, and even throwing a barbecue grill down on someone.

A man across the street fired a shot in the air. Johnson, Harris, Hooks, and the Walkers ran toward the man with the gun. Johnson broke out a car window.

When the police arrived, everyone scattered. Lowe saw Johnson, Harris, Hooks, and the Walkers go in the back door of Big Momma's, which was across the street from where Lowe lived.

After the police left, Lowe and his girlfriend, Regina Gripp, went over to Big Momma's to talk to Johnson, Harris, Hooks, and the Walkers about what had happened. Misty Miller and defendant followed Gripp and Lowe up onto Lowe's porch, and when Lowe shut the door, someone broke the glass out of it.

Lowe heard several voices outside his apartment. Harabia Johnson broke windows in the apartment with a two-by-four. Lowe called the police, and then he heard defendant outside yelling, "Over here, over here." Lowe thought that defendant was telling someone else which room Lowe was in. In a short time a Molotov cocktail was thrown through a bedroom window. It set fire to the bed, the curtains, and the walls.

Lowe testified that, in addition to hearing defendant say, "Over here, over here," he also heard him say, "Stop." Lowe heard four voices outside, and he identified them as the voices of defendant, James Walker, Harabia Johnson, and Misty Miller.

The remaining charges stemmed from an incident at the apartment of Jerome Alcorn. On July 21, 1990, at approximately 5:00 a.m., Jerome Alcorn answered a knock at his apartment door. Alcorn saw James Walker, Dejuan Harris, and three others. Alcorn had known James Walker for a short time, and he knew Harris as a person who frequently accompanied James Walker.

Alcorn receives social security disability benefits because of his dyslexia. He described himself as having "to take a slower pace than most to gather up on things" and having "a tendency to get very flustrated easily."

Alcorn was asked if D.G. was there, and when he replied that she was not, the group left. D.G. had moved in with Alcorn a month or so earlier to get away from some bothersome neighbors at her former residence. D.G. knew James Walker and Harris, and they had helped her carry her suitcases into Alcorn's when she moved in. D.G. generally slept on the couch in Alcorn's one-bedroom apartment. Occasionally they traded so that she slept in the bed and Alcorn slept on the couch.

Approximately 15 minutes after knocking at Alcorn's door, the group returned with some groceries. When Alcorn answered the door James Walker pushed past him and entered the apartment along with Harris, defendant, and several other people who were not known to Alcorn. Alcorn asked them to leave, and James Walker said that they would not leave and Alcorn could not make them leave.

Alcorn testified that he knew he could not force the intruders out of his apartment because he was outnumbered. He sat down and smoked his pipe; the intruders sat in the living room. At that time he overheard conversation among the others about, "A Crip's got to have this; a Crip's got to have that."

According to Alcorn, D.G. arrived a short time later, and she and James Walker went, at his request, into another room to talk. James Walker came back to the living room angry—screaming and raving at Alcorn. James Walker picked up Alcorn and threw him down.

While Alcorn was on the floor, defendant, in a very violent tone, ordered him to get up. When Alcorn stood up, defendant picked him up and threw him backwards so that Alcorn landed on his back.

Then Harris twice bit Alcorn's shoulder, put a trash bag over Alcorn's head, and tried to strangle him. Between bites, Harris declared that Alcorn did not taste good and went to the kitchen for garlic salt.

Alcorn heard racist comments being made, was spit on, and was called a "faggot." Harris threatened to sodomize him. Alcorn

ran into the bathroom; no one followed him. He changed from his pajama bottoms into street clothes and tried to leave the apartment, but was prevented by the intruders from going out.

While the group was in the apartment, Alcorn was sent out to get a can of soda for James Walker from the vending machine, which was located about three feet from the front door. Someone stood in the doorway while Alcorn went out. He testified that he went back into the apartment rather than trying to run away because D.G. remained in the apartment with the intruders.

Two boys who were friends of Alcorn's brother came to the apartment while the intruders were there. They wanted to retrieve some maps Alcorn had borrowed. James Walker answered the door and stayed by the door while Alcorn returned the borrowed maps. The boys left. Alcorn did not try to tell them what was occurring in the apartment.

Alcorn testified that while he was being thrown around and threatened, D.G. was in the living room. James Walker made her sit on the couch, he bit her on the cheek, and the others got "rowdy, very violent and foul-mouthed."

D.G. testified that when she arrived at Alcorn's apartment early in the morning on July 21, 1990, James Walker, Harris, defendant, Johnson, and Hooks were there. She tried to go to bed to get some sleep, but James Walker would not let her. She went into the bathroom and smoked a cigarette.

Later James Walker told her to go into the bathroom. James Walker tried to get her to perform oral sex, but she pushed him away. James Walker pulled D.G.'s head toward him and touched his penis to the "middle top part" of her lips. She threatened to burn him with her cigarette, and he choked D.G. and hit her.

James Walker then brought defendant and Hooks into the bathroom one at a time. James Walker said that he was going to show them "how it's done," and he hit D.G. and tried again to get her to perform oral sex. James Walker had defendant and Hooks hit D.G.

Defendant slapped D.G., and, when she refused to perform oral sex for him, he slammed her against the bathtub and hit her. The scene was repeated with Hooks.

After defendant and Hooks left, James Walker returned to the bathroom. D.G. testified that she "got beat up some more" and

went down on the floor. James Walker told her she "better shut up," and he held her down, choked her, and raped her.

Alcorn testified that during the time D.G. was in the bathroom he was being guarded by Hooks. He heard a scuffle and heard D.G. scream.

D.G. testified that after she and James Walker returned to the living room, Harris picked up a knife and said, "Let's do a homicide." James Walker agreed, and then the others joined in saying, "Yeah, man, let's do a homicide." D.G. testified that Alcorn was upset. He picked up another knife and said that he was going to kill himself. Harris told him not to kill himself because "[w]e want to."

Alcorn testified that it was James Walker who, with a knife in his hand, asked, "Anyone up for a homicide?" The others said that they were game, but then let the idea fade. They began to calm down and choose their places in the apartment in which to go to sleep.

As the intruders began to fall asleep, D.G. went into the bathroom, turned on the water, and broke something on the window so that it could be opened. She called for Alcorn to come into the bathroom on some pretense. When Alcorn got into the bathroom, the two of them went out the bathroom window and ran to a nearby apartment building where they called the police.

We first consider if the district court erred in overruling defendant's motion for a mistrial. Defendant is black. Of the 60 venirepersons called for jury service in his trial, only one, Donna Williams, was black. She was one of the 48 venirepersons passed for cause, but then the State used a peremptory challenge to remove her from the panel.

Defendant challenged the State's removal of Williams pursuant to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), and requested a mistrial. At the time the mistrial was requested, the jury had been selected, but it had not yet been sworn.

Without making any findings as to the merits of defendant's motion, the district court judge gave the prosecutor an opportunity to respond. The State denied striking Williams on the basis of her race. The explanation for striking her was that the prosecutor wanted jurors who were older and who were stable. He

believed that other pool members better fit those qualifications than Williams, who was "youthful," divorced, a single parent, and lived with her sister.

The district court denied defendant's motion, concluding that the prosecutor had stated nonracial and nondiscriminatory reasons for using his peremptory challenge to exclude Williams.

Defendant first contends that the standard of review is "clear error" rather than abuse of discretion. He relies on the following language from *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991):

"In the case before us, we decline to overturn the state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous. It 'would pervert the concept of federalism' [citation omitted] to conduct a more searching review of findings made in state trial court than we conduct with respect to federal district court findings." 500 U.S. at 369.

This court has stated that "appellate review of a trial court's acceptance of the State's announced reasons for removal of a juror as being racially neutral is on the basis of abuse of discretion." *State v. Sledd*, 250 Kan. 15, Syl. ¶ 2, 825 P.2d 114 *cert. denied* ____ U.S. ____ (October 5, 1992). We therefore apply the abuse of discretion standard in the present case; however, our conclusion would be the same under the clear error standard.

Purposeful racial discrimination in using peremptory challenges is forbidden by the Equal Protection Clause of the Fourteenth Amendment to the federal Constitution. *State v. Hood*, 242 Kan. 115, 744 P.2d 816 (1987), following *Batson*, 476 U.S. 79. As in any equal protection case, the burden of proving the existence of purposeful discrimination is on the defendant who alleges discriminatory selection. 476 U.S. at 96.

The evidentiary formulation requires the defendant to make a prima facie showing of purposeful discrimination. 242 Kan. at 119, following 476 U.S. at 96. Once a prima facie showing is made, the burden shifts to the State to come forward with a nondiscriminatory explanation. 242 Kan. at 120.

In *Hernandez v. New York*, 500 U.S. 352, the Supreme Court considered a case where the prosecutor defended his strikes even though the trial court had not ruled whether the defendant had made a prima facie showing. The court concluded that "[o]nce a

prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." 500 U.S. at 359.

In the present case, as in *Hernandez*, the prosecutor resolved the question of a prima facie showing in the defendant's favor by jumping in with a defense of his use of the peremptory challenge. The next step for the district court is to determine whether, "assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." 500 U.S. at 359.

Defendant does not seem to be arguing that there is a discriminatory intent inherent in the State's explanation that mature years and stability were the juror characteristics it sought. He does not argue that the criteria will have a disproportionate impact on one race or another.

Defendant argues that Donna Williams satisfied the juror "profile" specified by the State. She had a seven-year employment history with Wichita State University and, at the time of trial, managed an office there. In addition, the State "passed the group of twelve venirepersons, which she was among, for cause without asking any questions."

Defendant does not dispute the State's assertion that Donna Williams, being "somewhat youthful," did not bear the "more mature age" preferred for members of this jury. With respect to stability, defendant correctly notes stability in Williams' employment but does not refute that her marital history, which was the focus of the State's inquiry, is not stable. Thus, it does not appear that Williams possesses the juror characteristics sought by the State.

He also argues that, as a matter of law, single parenthood has been rejected in this state as a credible race neutral reason. *State v. Belnavis*, 246 Kan. 309, 313, 787 P.2d 1172 (1990). *Belnavis* does not support such a conclusion. In *Belnavis*, this court concluded that the State's explanation for challenging a young, single black mother was not credible because similarly situated white jurors were not challenged and because the black mother had

not responded to a general question about whether family concerns would prevent her from effectively performing the duties of a juror.

As a matter of fact, defendant argues that the State's failure to strike jurors comparable to Donna Williams, as well as its striking of venirepersons who matched the preferred "profile," demonstrates that the explanation is not credible. Defendant relies on the direction in *Belnavis* to "compare the characteristics of the individuals stricken with those not stricken." 246 Kan. at 312.

Individuals who were not stricken and who defendant contends are comparable to Williams are Steven Standley and Lois Mitzel. Standley and Mitzel, in part, testified:

"THE COURT: . . . Mr. Steven Standley. Mr. Standley is an air guard technician.

"MR. STANDLEY: Yes, ma'am.

"THE COURT: How long have you been in the air guard?

"MR. STANDLEY: Five years.

. . . .

"MR. STANDLEY: That's a full-time job, ma'am.

"THE COURT: Okay. Are you in a position to be possibly activated for service in light of the—

"MR. STANDLEY: At the moment, no.

"THE COURT: Okay. Are you married?

"MR. STANDLEY: No, ma'am.

"THE COURT: Okay. And do you have any children?

"MR. STANDLEY: No.

"THE COURT: Okay. Thank you, Mr. Standley."

. . . .

"THE COURT: . . . Ms. Lois Mitzel. Ms. Mitzel has listed two different jobs. She is a dental receptionist for a local dentist, and she also works with Sears in telemarketing. Now, did I do that correctly, Ms. Mitzel?

"MS. MITZEL: That's correct.

"THE COURT: Okay. How long have you been a dental receptionist?

"MS. MITZEL: Well, for dentist—I worked for my brother, and then he sold his practice, and so all in all, about eleven years.

"THE COURT: And how long have you been employed with Sears now?

"MS. MITZEL: It lacks a month being two years.

"THE COURT: Okay. And are you married?

"MS. MITZEL: No.

"THE COURT: Okay. Are there any children or other adults living in your household?

"MS. MITZEL: No.

"THE COURT: Okay. Thank you very much, Ms. Mitzel."

The ages of Standley and Mitzel are not revealed in their answers to these questions. Both answered "no" to the question whether he or she was married; neither was asked whether he or she was divorced. Standley said that he did not have any children; Mitzel said that there were no children living in her household. There is not sufficient information in the record on which to base a comparison of the ages and marital histories of Donna Williams and individuals not stricken.

The final part of defendant's argument is not one suggested in *Belnavis*. There, the court employed comparison of the characteristics of stricken and non-stricken venirepersons on the ground that the presence in an unchallenged white juror of the characteristic articulated as the reason for challenging a black venireperson "convincingly refutes the State's racially neutral reason." 246 Kan. at 313. Defendant advocates comparison of the characteristics of stricken venirepersons with the State's preferred "profile" characteristics. The question is whether this comparison could achieve the same result, *i.e.*, a convincing refutation of the stated reason, as the comparison of characteristics of stricken and non-stricken venirepersons.

Defendant lists 12 individuals who were stricken as married or widowed. Some are retired and/or have grown children. Without more development, however, defendant's list does not have much significance. It is not reasonable to draw the inference from the sketches provided by defendant that the State was not really seeking older jurors whose marital histories were stable. The State never contended that the only characteristics it preferred were mature age and marital stability. The prosecutor stated that he struck Donna Williams because of her youthfulness and her history of divorce. There is nothing in the record from which this court can discern his reasons for striking the people listed by defendant. We find no abuse of discretion by the district court.

We next consider if the district court erred in denying defendant's motion to discharge the jury panel. Defendant joined with a number of other defendants in pretrial proceedings in challenging the procedure used by Sedgwick County for selecting jury panels. The district court denied the motions of the defen-

dants. Darrell Bailey, along with defendant, was one of the challenging defendants. In *State v. Bailey*, 251 Kan. 156, 161, 834 P.2d 342 (1992), this court considered the question of the jury selection process as it was raised by Bailey in his appeal from jury trial convictions.

This court concluded that Bailey had not made a prima facie showing that Sedgwick County's practice of using voter registration lists "systematically or purposefully excluded a cognizable group." 251 Kan. at 163. The deficiency in his proof resulted from the absence of a precise identity between persons who do not choose to register to vote and minority persons. 251 Kan. at 162.

Notwithstanding the filing of this court's opinion in *Bailey* in May 1992, defendant failed to include any discussion of *Bailey* in his reply brief of August 1992. Comparison of the two cases reveals that the grounds on which defendant appeals the district court's denying the joint motion to discharge the jury panel are no broader than the grounds urged by Bailey. There is a difference between the two cases in that here defendant offered evidence that only one minority person was called for jury service for his trial. Bailey "offered no statistics on how many minority persons were called for jury service for his trial." 251 Kan. at 160.

What defendant shows is that minorities were underrepresented among the persons called for jury service for his trial. What this court found wanting in Bailey's presentation was not lack of evidence that minorities were underrepresented, but rather that a cognizable group of persons had been excluded. Thus, the additional showing made by defendant does not remove his case from application of the rule stated in *Bailey*. We find no merit in defendant's argument.

Defendant next argues that the district court erred in authorizing defendant's prosecution as an adult. Defendant urges that there are three grounds upon which the court's order authorizing his prosecution as an adult should be reversed. First, he argues that the court's failure to give him individual consideration constituted a denial of due process. Second, he contends that the court failed to give adequate and appropriate consideration to the factors specified in K.S.A. 1991 Supp. 38-1636. Third, he con-

tends that his life sentence is cruel and unusual punishment for an offender of his age.

Defendant asserts that he turned 14 on July 1, 1990. K.S.A. 1991 Supp. 38-1636, which permitted the adult prosecution of 14-year-old minors, took effect that same day. Three weeks later the incidents at issue occurred. Upon the State's motion, the court authorized prosecution of defendant as an adult under the applicable criminal statutes. Defendant was convicted on eight felony counts and sentenced to life imprisonment.

We first consider his due process argument. There are two aspects to defendant's contention that he was deprived of individual consideration and thus denied due process. One is that he and Rodney Hooks were lumped together in joint proceedings before the judge of the juvenile division of the district court. The other is that he was viewed as a member of a gang. Defendant relies on *Kent v. United States*, 383 U.S. 541, 562, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966), for the proposition that the court's failure to consider him as an individual constituted a violation of due process.

Defendant does not argue that separate hearings should have been conducted on the motions to prosecute him and Hooks as adults. The State argues that the record does not support defendant's claim that he did not receive individualized treatment.

In *Kent*, the Supreme Court considered the case of a 16-year-old boy in which the juvenile court, without a hearing, waived its jurisdiction so that the boy could be prosecuted as an adult. The court concluded that

"as a condition to a valid waiver order, [Kent] was entitled to a hearing, including access by his counsel to the social records and probation or similar reports which presumably are considered by the court, and to a statement of reasons for the Juvenile Court's decision. . . . [T]his result is required by the statute read in the context of constitutional principles relating to due process and the assistance of counsel." 383 U.S. at 557.

None of the deficiencies of the waiver of the juvenile court's jurisdiction over Kent is involved in the present case. Moreover, the rationale of *Kent* has a statutory basis rather than a constitutional one. The case offers no support for defendant's position.

There is a transcript of the ruling of the juvenile division judge on the State's motions to prosecute Rodney Hooks and defendant

as adults. The court discussed each of the eight factors set forth in K.S.A. 1991 Supp. 38-1636(e).

Examination of the court's remarks reveals that they were approximately evenly divided between Hooks and defendant. For some of the eight factors Rodney Hooks and the offenses with which he was charged dominated the remarks, and for other factors defendant was spotlighted.

For example, the court's remarks about the seriousness of the alleged offense and protection of the community focus on Hooks. They are as follows:

"When you look at the charges, and they range from the lowest being a D Felony or the highest being A Felony offenses, they certainly do not get any more serious and in regard to Rodney's case, the homicide, there is no case that's considered under the law any more serious, so I think that is established. There's an issue of whether the protection of the community requires prosecution as an adult. There's some indication here that this is—both incidents are in essence victimizing people and in the case with Sylvester Johnson and Roseanna Johnson that it didn't—the incident didn't start out intending to end up the way it did and it seems like something went completely out of control there so there's some issue of—of protecting innocent citizens there."

The incident involving Sylvester Johnson and Rose Ann Johnson occurred the night of July 21, 1990. Defendant was not charged with having any involvement in it. An account of the incident appears in *Bailey*, 251 Kan. at 158-59.

On the other hand, the court's consideration of previous history dwells more on defendant than on Hooks:

"Now we're getting into some more subjective issues, previous history including previous adjudications. Rodney has a list of three prior adjudications. We have two here, they are all misdemeanor—what would be misdemeanors, but there's also indication of offense against a person there and in Greg's case we have a more extensive record. We have a—two previous committments [sic] to SRS custody and the fact that the offenses alleged here were committed while Gregory was on conditional release. In reviewing those we have cases that would be felonies if [they] had been committed by adults. We have some—some cases in which they committed [crimes] against persons and as a matter of fact, if Greg would have been sixteen when this offense occurred he would have been an automatic referral."

Defendant contends that the court failed to differentiate between his conduct and that of Hooks. The contention centers on the assertion that defendant, in contrast to Hooks, was a "minor

player" in relatively minor offenses. The court's pretrial consideration of the seriousness of the alleged offenses cannot be based on evidence; it is based on the charges filed and the State's allegations. At the time of the hearing on the motion for adult prosecution, defendant had 10 felony charges pending against him. Two were class A felonies, and three were class B felonies. As the court noted, "they certainly do not get any more serious." The evidence which eventually was presented in this case tends to show that defendant understates his role. Moreover, the seriousness of the alleged offenses is only one of eight factors which must be considered in determining whether a juvenile should be prosecuted as an adult. K.S.A. 1991 Supp. 38-1636(e).

Defendant's contention that he was considered as part of a gang rather than as an individual seems to be based on the following statements of the court:

"In determining whether the interests of the Respondents or the community would be better served by criminal prosecution, in certain respects I think the community would be better served. Citizens have a right to be protected from this type of activity. Whether the Respondents would benefit, well, there's a very distinct issue there, but in certain respects if these young men continue in their associations and continue the type of activities they are involved in, running around with the type of people they are running around with, living the lifestyle they're apparently living, my question is what kind of future would they have at all if something isn't done to change that right away?"

These comments reflect the court's concern that defendant, at the impressionable age of 14, was associating with and emulating the actions of unsuitable models. The treatment of defendant is as an individual, and there is no undue emphasis on his gang membership. We find no merit in defendant's argument that he was denied due process.

Defendant's argument next centers on K.S.A. 1991 Supp. 38-1636(e)(6). He contends that the court misinterpreted the legislature's directive to consider the sophistication or maturity of the juvenile. According to defendant, "maturity" as used in the statute should be equated with "mature in the adult sense of the word." He argues that he lacks this type of maturity.

The court stated:

"Sophistication and maturity, well, we've got different concepts of maturity here. Many people would consider a mature fourteen or fifteen year old

would be the guy who goes to school every day, gets good grades and maybe is involved in extra-curricular activities, those types of things, that might be considered a mature teenager, somebody that could accept responsibility and be trusted and we also have a different type of sophistication and maturity and that's based on home environment, patterns of living and in many respects what I see here are two young men who've adopted the traits and activities of older people, and these are older people who are not appropriate people to be emulating, but here we are involved in—there's evidence here of use of alcohol, there's staying out all hours of the night and day. In many respects these young men are being asked to be treated as mature and sophisticated within that environment they've chosen to be involved in. Certainly their activities are inconsistent with what a quote, unquote 'typical fourteen or fifteen year old' would be."

We find the court's remarks reflect a reasonable interpretation of the statutory factor. The defendant's interpretation seems questionable. Because it is the lack of maturity "in the adult sense of the word" which earmarks most criminal activity, irrespective of the age of the offender, that lack would not be a very useful standard for determining whether to prosecute as an adult.

The district court considered the eight factors set out in K.S.A. 1991 Supp. 38-1636. As we noted in *State v. Hooks*, 251 Kan. 755, 840 P.2d 483 (1992):

"Factor seven is but one of eight factors which the statute requires the court to consider in making the determination, but the statute specifically provides that '[t]he insufficiency of evidence pertaining to any one or more of the factors listed in their subsection shall not in and of itself be determinative of the issue.' K.S.A. 1991 Supp. 38-1636(e)." 251 Kan. at 759.

The failure to find one or more of the factors adverse to the juvenile does not preclude the trial court from determining that a juvenile should be prosecuted as an adult.

Defendant next contends that his life sentence is cruel and unusual punishment in the following circumstances: (1) He was barely 14 at the time of the offenses; (2) he did not commit a homicide; and (3) there is no "clear evidence" that he was liable as a principal for any serious offense, *i.e.*, class A or B felonies. He relies on *Stanford v. Kentucky*, 492 U.S. 361, 106 L. Ed. 2d 306, 109 S. Ct. 2969 (1989), and *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982).

The first two circumstances are uncontroverted. As to the third, the testimony of both Jerome Alcorn and D.G. identifies defendant as one of the people who threatened them and beat them.

Their testimony also identified defendant as actively involved in forcefully confining them in the apartment or in a room of the apartment. Thus, there is evidence that defendant was an active participant in the aggravated kidnappings of Alcorn and D.G. Aggravated kidnapping is a class A felony.

Defendant is correct in contending that the charges of aggravated criminal sodomy and rape of D.G., class B felonies, were based on the conduct of James Walker. With regard to the aggravated arson, Lowe's testimony was that he identified the voice of defendant shouting, "Over here, over here" shortly before a Molotov cocktail was lobbed through his window. One might infer that someone other than defendant threw the Molotov cocktail, but, nonetheless, defendant's active participation is obvious.

The cases relied on by defendant are of little help to him. The issue in *Stanford* was whether the imposition of the death penalty for a murder committed when the defendant was 16 or 17 years old constituted cruel and unusual punishment. The Supreme Court concluded that it did not.

At issue in *Enmund* is the death penalty rather than a sentence of life imprisonment. Moreover, it involves the imposition of the death penalty for felony murder where the defendant's only participation was driving the escape car. In the present case, the evidence supports a finding that defendant actively participated in at least two counts of aggravated kidnapping and one count of aggravated arson.

We find no error or abuse of discretion in the district court's determination that the defendant be prosecuted as an adult.

Defendant next argues that the district court erred in excluding evidence of a sexual relationship between James Walker and D.G. Before trial defendant filed a motion, supported by his affidavit, requesting permission to introduce evidence that James Walker and D.G. had had sexual relations before July 21, 1990. In his affidavit, defendant stated that he had been present on one occasion before July 21, 1990, when James Walker had consensual sex with D.G. and that James Walker told the affiant that the sexual relationship was a continuing one.

The basis for the motion (the defendant's theory of the relevance of the evidence he sought to introduce) is that defendant was charged with aiding and abetting James Walker's rape and

aggravated criminal sodomy of D.G. Because defendant thought that previous sexual activity between James Walker and D.G. had been consensual, he claims he could not have foreseen that the nonconsensual crimes of rape and aggravated criminal sodomy would be committed. At trial, the district court instructed the jury that a defendant charged with aiding and abetting is guilty of unintended crimes which were reasonably foreseeable. Thus, according to defendant, the evidence was relevant to disprove his aiding and abetting.

K.S.A. 1991 Supp. 21-3525(2) provides in pertinent as follows:

"[E]vidence of the complaining witness' previous sexual conduct with any person including the defendant shall not be admissible, and no reference shall be made thereto in the presence of the jury, except under the following conditions: The defendant shall make a written motion to the court to admit evidence or testimony concerning the previous sexual conduct of the complaining witness. The motion must be made at least seven days before the commencement of the trial unless that requirement is waived by the court."

Defendant's motion was filed on February 6, 1991. Trial began on February 7, 1991. Defendant concedes that his motion was not timely filed, but adds, "[H]owever, it appears that the trial judge, in accordance with statute, waived the notice requirement." There is no record reference for the assertion that the court waived the requirement. The court's denial of the motion consists in its entirety of a note on a motion docket minutes sheet form. There is no mention of waiver, nor is any reason given for denial.

"On review the trial court's ruling should stand absent a showing of abuse of discretion." *State v. Stellwagen*, 232 Kan. 744, 747, 659 P.2d 167 (1983). Defendant contends that the district court abused its discretion in that it diminished his constitutional right to present a defense. In this regard he cites *Michigan v. Lucas*, 500 U.S. 145, 149, 114 L. Ed. 2d 205, 111 S. Ct. 1743 (1991); *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973); and *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989).

In *Lucas*, the Supreme Court upheld the preclusion of evidence of a prior sexual relationship on the basis of a Michigan statutory requirement that a motion and offer of proof be filed within 10 days after arraignment. Michigan, like Kansas, has a rape shield

statute which generally precludes evidence of an alleged rape victim's past sexual conduct. The Michigan statute, however, is unlike our statute in that it is silent as to the consequences for noncompliance with the notice requirement. The Supreme Court held that the Michigan Court of Appeals erred in adopting a per se rule that preclusion of the evidence under the Michigan rape shield statute violated the Sixth Amendment rights of the defendant. 500 U.S. at 152.

In *Chambers*, the issue was not the exclusion of evidence of prior sexual conduct. Chambers was found guilty of murder after he was prevented from cross-examining a witness who had made three oral confessions and a written confession of the murder. The Supreme Court found that Chambers had been denied a fair trial in violation of due process.

In *Gonzales*, this court upheld the exclusion of "evidence of the tendency of a victim of attempted rape and felony murder to form 'social acquaintances with men on a spontaneous basis.' " 245 Kan. 691, Syl. ¶ 2. Gonzales argued that it was essential to his defense that he show the possibility that the victim had been with another man as well as with him on the night of her murder. 245 Kan. at 699. This court concluded that Gonzales' right to a fair trial had not been violated because the excluded evidence "did not constitute an *integral* part" of his defense. 245 Kan. at 700. *Chambers* was distinguished as "deal[ing] with evidence which either directly challenged evidence presented by the prosecution or evidence which directly implicated another specific individual as the perpetrator of the crime." 245 Kan. at 700.

We do not reach the merits of the defendant's argument. Absent waiver by the district court, failure to file the required motion within the time specified by the statute precludes admission of the evidence at trial. In *Stellwagen*, we noted that the rape shield statute represented a legitimate State interest in protecting the rape victim. It also provides protection against surprise to the prosecution. The notice and hearing requirements of the statute permit the trial court to determine if the "evidence proposed to be offered by the defendant regarding the previous sexual conduct of the complaining witness is relevant and is not otherwise inadmissible as evidence." K.S.A. 1991 Supp. 21-3525(2).

The notice requirement of the statute is clear. It was the defendant's unexplained failure to comply with the notice provision that precluded the district court from determining if the evidence was relevant and admissible. As a result, the defendant's Sixth Amendment right to present his evidence was not diminished by the district court's action. We find no error in excluding the evidence.

We next determine if the district court erred in admitting evidence of defendant's gang membership. Defendant argues that he was deprived of a fair trial as guaranteed by "due process of law" by the State's introduction of evidence of his gang affiliation. He asserts that the State "prey[ed] on the all-white jury's fear of minority street gangs" in order to get guilty verdicts. He likens use of the word "gang" in this context to calling someone a communist in the 1950's or a witch in 17th-century Salem.

Before any evidence was presented at trial, the district court heard the State's proffer of the testimony of Kenneth Lowe. The purpose of the proffer, as stated by the court, was "to have the opportunity to consider the admissibility of evidence of gang affiliation." It appears that the State rather than defendant initiated the court's pretrial consideration of admissibility of the evidence.

The district court ruled that evidence of defendant's association with members of a gang called the Insane Crips was admissible. The court noted that defendant had told Lowe that he was a member of the Crips. The court concluded that the evidence was relevant in particular to the charge of aggravated arson and that, for the purpose of K.S.A. 60-455, it showed intent, motive, and preparation. The court expressly found that the probative value of the evidence outweighed possible prejudice.

With regard to the applicability of K.S.A. 60-455, in *Bailey* this court stated:

"As an additional argument on this issue, defendant contends that admission of such evidence violated K.S.A. 60-455 as such was evidence of commission of a crime or other civil wrong. Inasmuch as membership alone in the Insane Crips gang is not a crime or civil wrong, this point lacks merit." 251 Kan. at 166.

Defendant concedes that no objection was made during trial when evidence of his gang affiliation was introduced. He urges the court to consider the admissibility of the evidence under the

"exceptional circumstances doctrine." He cites *State v. Williams,* 15 Kan. App. 2d 656, 815 P.2d 569 (1991). In *Williams,* there was no issue of failure to object to the admission of evidence. The issue was whether constitutional grounds not raised at the trial level should be considered by the appellate court. 15 Kan. App. 2d at 663.

In *Bailey,* this court declined to entertain the issue of the admission of evidence of gang membership due to defendant's failure to object. 251 Kan. at 166. The court recited the rule that a motion in limine must be followed by specific objection to the introduction of evidence in order to preserve the issue for appeal. 251 Kan. at 166.

Defendant cites *Dawson v. Delaware,* 503 U.S. ___, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992), for the proposition that admission of irrelevant evidence of gang membership offends the First Amendment right to free association.

The issue in *Dawson* was whether introduction during the capital penalty phase of the murder trial of evidence of defendant's affiliation with a white racist prison gang violated the First Amendment. It did in the circumstances of *Dawson* where it was not relevant. The Supreme Court concluded that the evidence showed "nothing more than Dawson's abstract beliefs." 503 U.S. at ___, 117 L. Ed. 2d at 318. Racial hatred was not involved in the killing—Dawson and the victim were white, and no other circumstances which would warrant introduction of the evidence were identified. 503 U.S. at ___, 117 L. Ed. 2d at 318.

In *State v. Hooks,* we said: "The evidence admitted was a part of the res gestae . . . . Further, there was considerable evidence that the perpetrators acted in concert with one another. An aiding and abetting instruction was given herein." 251 Kan. at 765.

In the present case, the district court concluded that evidence of defendant's gang affiliation was relevant. The evidence was introduced for the most part by complaining witnesses who told of Crips rhymes and sayings being repeated by the defendant and others in his group either during or shortly before the commission of the crimes. There was considerable evidence that they acted in concert, and an aiding and abetting instruction was given.

The following principles are stated in *Hooks:*

"The admissibility of evidence is governed by its relevancy to the issue in question. *State v. Reynolds*, 230 Kan. 532, Syl. ¶ 4, 639 P.2d 461 (1982). Relevant evidence is evidence 'having any tendency in reason to prove any material fact.' K.S.A. 60-401(b). The exclusion of evidence is within the discretion of the trial court. *State v. Reynolds*, 230 Kan. at 536." 251 Kan. at 765.

Thus, it is concluded that there is "no abuse of discretion in the trial court's determination that complained-of evidence of gang membership was relevant and should be admitted [against Hooks]." 251 Kan. at 766.

The present case differs somewhat from *Hooks* in that Hooks relied on a compulsion defense and, in this context, defense counsel asked him some questions about his gang participation. This court, however, did not rely on the assertion of the compulsion defense in concluding that the trial court had not abused its discretion.

The most noteworthy feature of the present case is that a group of young men and boys acted in concert in bullying and brutalizing their neighbors. Their numbers were intimidating to their victims, and it is doubtful that they could have perpetrated their crimes without the strength of the group. It was not necessary for the State to identify defendant with a specific, named gang in order to show the dynamics and effect of the group. On the other hand, it was not irrelevant to show that defendant identified himself as a member of a gang. Here, as in *Hooks*, the evidence was relevant and part of the res gestae. We find no error in the admission of the evidence in the present case.

The defendant next challenges his conviction of aggravated criminal sodomy. He makes various arguments why his conviction of aggravated criminal sodomy should be reversed. We find none of the arguments has merit.

He first argues that it is fundamentally unfair to convict him of aiding and abetting aggravated criminal sodomy when the principal, James Walker, was convicted of the lesser offense of attempted aggravated criminal sodomy.

K.S.A. 1991 Supp. 21-3205(3) provides as follows:

"(3) A person liable under this section may be charged with and convicted of the crime although the person alleged to have directly committed the act constituting the crime lacked criminal or legal capacity or has not been

convicted or has been acquitted or has been convicted of some other degree of the crime or of some other crime based on the same act."

In *State v. Norwood*, 217 Kan. 150, 535 P.2d 996 (1975), the defendant argued that he could not be convicted of aiding and abetting his codefendant who had been acquitted of the crime charged. This court quoted subsection (3) of K.S.A. 21-3205 and summarily rejected Norwood's argument as being in direct contradiction to the statute. 217 Kan. at 157. *Norwood* is controlling in the present case.

Defendant next contends the evidence was not sufficient to support his conviction of aggravated criminal sodomy. Defendant contends that the evidence "at most showed that James Walker's penis touched D.G.'s lips." He further contends that the instruction on penetration permitted the jurors erroneously to conclude, based on this evidence, that the State had proven aggravated criminal sodomy.

The jury was instructed that one of the essential elements which must be proved by the State to establish the commission of aggravated criminal sodomy is "[t]hat there was actual penetration." The instruction defining penetration states: "Any penetration, however slight, is sufficient. (The lips constitute the entrance to, and are a part of, the mouth.)"

Walker relies on *State v. Moppin*, 245 Kan. 639, 783 P.2d 878 (1989), and Justice Lockett's dissenting opinion in *State v. Schad*, 247 Kan. 242, 247-49, 795 P.2d 406 (1990), in support of his contention that the instruction was erroneous as a matter of law. These cases have no application here. They involve oral stimulation of the genital area of a female. He relies on *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781, *reh. denied* 444 U.S. 890 (1979), for the proposition that the verdict cannot stand because the evidence would not permit a rational factfinder to find that the offense had been committed. *Jackson* does not apply. The primary issue was "what standard is to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence." 443 U.S. at 309.

The prosecutor asked D.G. to demonstrate "how James Walker's penis *touched* your lips." She verbally responded, "Just right there," and the court reporter noted that the witness was "in-

dicating." The State argues that "[f]rom this demonstration, the jury must have concluded that James Walker's penis penetrated the victim's lips, even if only slightly."

The State argues, with regard to the demonstration, that defense counsel should have made a record of what D.G. showed to the jury. The State further argues that this court must accept that the district court acted properly due to the defendant's failure to furnish a record affirmatively showing error. We agree. D.G. was asked to demonstrate how defendant's penis touched her lips, and she did so. However, the record is devoid of any amplification of her demonstration. The jury and the district court observed D.G.'s demonstration, and the record before us is not sufficient for this court to find the evidence insufficient to support a finding by the jury that penetration occurred nor do we find any error in the instruction.

Finally, defendant argues that his convictions for aggravated assault should be reversed on the ground that they are multiplicitous with the convictions for aggravated kidnapping. He asserts that the convictions arose from a single incident and involve only one continuous act of violence. He relies on *State v. Racey*, 225 Kan. 404, 408, 590 P.2d 1064 (1979), and *State v. Lassley*, 218 Kan. 758, 761-62, 545 P.2d 383 (1976). He cites *State v. Freeman*, 236 Kan. 274, 689 P.2d 885 (1984), for the rule that multiplicitous convictions violate the guarantee against double jeopardy.

This court recently stated the following principles:

"Multiplicity exists when the State uses a single wrongful act as the basis for multiple charges. Charges are not multiplicitous if each charge requires proof of a fact not required in proving the other. Charges are also not multiplicitous when the offenses occur at different times and in different places.

"A test for determining whether a continuous transaction results in the commission of but a single offense is whether separate and distinct prohibited acts, made punishable by law, have been committed. A single motive for a series of acts does not necessarily result in a single crime.

"Multiplicity does not exist if an act of violence is intermittent or separate and wholly unrelated to the other acts of violence." *State v. Woods*, 250 Kan. 109, Syl. ¶ 6, 7, 8, 825 P.2d 514 (1992), *cert. denied* ___ U.S. ___ (October 5, 1992).

The defendant was convicted of aggravated kidnapping of D.G. for confining her in the bathroom where he beat her and tried to get her to perform oral sex for him. He was convicted of aggravated assault of D.G. for aiding another member of the group, who threatened her with a knife. These acts occurred in different rooms at different times. Separate and distinct prohibited acts were committed.

The conduct for which defendant was convicted of aggravated kidnapping and of aggravated assault of Jerome Alcorn seems less easily compartmentalized. Alcorn was confined to his apartment. During his confinement, there were some periods when he was being watched, but generally it seems that he was not being bothered. There also were intermittent bursts of activity. During one of these episodes, defendant struck Alcorn and threw him down. It appears from Alcorn's testimony that this beating took place before the three men went into the bathroom with D.G. Later, after the three men and D.G. had emerged from the bathroom, there was another episode in which one of the members of the group threatened Alcorn with a knife. It was this later conduct which was the basis for the aggravated assault charge against the defendant.

The defendant's conviction of the aggravated kidnapping of Alcorn rests on defendant's inflicting bodily harm on Alcorn, which was separate and unrelated to the knife-waving conduct. These offenses occurred at different times; whether they occurred in different places is subject to question. Separate and distinct prohibited acts were committed. Thus, the convictions are not multiplicitous.

The judgment of the district court is affirmed.